Larry POYSER, Appellant–Defendant,

v.

Thomas A. FLORA and Marsha A. Flora, Appellee–Plaintiffs.

No. 43A03–0207–CV–232.

Court of Appeals of Indiana.

Jan. 10, 2003.

Jonathan J. Myers, Myers, Tison, Hockemeyer & McNagny, Columbia City, IN, Attorney for Appellant.

Martin T. Fletcher, Sr., Fletcher & Niemann, LLP, Fort Wayne, IN, Attorney for Appellee.

**OPINION**

ROBB, Judge.

Larry Poyser appeals the trial court's grant of summary judgment to Thomas Flora and Marsha Flora (collectively, "the Floras") on their complaint for recission of contract. We affirm.

### Issues

Poyser raises five issues, which we consolidate and restate as follows:

1. Whether the trial court properly found that Viatical Settlement Contracts were included under the Indiana Securities Act;

2. Whether the Indiana Securities Act's definition of "security" is unconstitutionally vague; and

3. Whether the trial court properly found that no genuine issues of material fact existed.

### Facts and Procedural History

In December 1997, Liberte Capital Group, Inc. (Liberte) sold Viatical Settlement Contracts (VSCs) to the Floras through Poyser, a licensed life insurance agent.[1] The Floras allege that Liberte accepted their money, yet did nothing regarding their account until September 1998. The Floras filed suit to recover the money paid to Liberte, contending that Poyser's sale of the VSCs violated the Indiana Securities Act (the "Act"), codified at Indiana Code sections 23–2–1–1 to –24. The Floras also contended that Poyser's sale of the VSCs was subject to Indiana security regulations and that the transaction violated the Act because the VSCs were not registered securities and Poyser was not registered as an agent as required by the Act.

Both parties filed Motions for Summary Judgment. The trial court entered an order for Partial Summary Judgment for the Floras on January 4, 2002, leaving the issue of attorney fees open for a future hearing. The order also denied Poyser's Motion for Summary Judgment. The trial court entered its final judgment, including attorney fees, on May 17, 2002. This appeal ensued.

---

1. A viatical settlement contract is an investment contract pursuant to which an investor acquires an interest in the life insurance policy of a terminally ill person—typically an AIDS victim—at a discount of 20 to 40 percent, depending upon the insured's life expectancy. *Securities and Exch. Comm'n v. Life Partners, Inc.,* 87 F.3d 536, 537 (D.C.Cir.).

When the insured dies, the investor receives the benefit of the insurance. *Id.* The investor's profit is the difference between the discounted price paid to the insured and the death benefit collected from the insurer, less transaction costs, premiums paid, and other administrative expenses. *Id.*

*Discussion and Decision*

## I. Standard of Review

In reviewing a motion for summary judgment, we apply the same standard as the trial court, and we resolve any question of fact or an inference to be drawn therefrom in favor of the non-moving party. *Bartle v. Health Quest Realty VII*, 768 N.E.2d 912, 916 (Ind.Ct.App.2002), *trans. denied.* Summary judgment is appropriate only if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Ind. Trial Rule 56(C).

Once the moving party has met this burden with a prima facie showing, the burden shifts to the non-moving party to demonstrate that there is a genuine issue of material fact for trial. *Bartle*, 768 N.E.2d at 916. Any doubt about the existence of a factual issue should be resolved against the movant, with all properly asserted facts and reasonable inferences construed in favor of the nonmovant. *Id.* The party appealing the grant of a motion for summary judgment bears the burden of persuading this court that the trial court erred. *Id.*

## II. Viatical Settlement Contracts

### A. Background and Purpose of the Indiana Securities Act and the *Howey* Test

■ By legislative design, the Act protects the public by preventing dishonest promoters from selling financial schemes to unwary investors who have little or no knowledge of the realistic likelihood of the success of their investments. Specifically, section 23–2–1–19 provides a description of the deceptive practices the Act was designed to prevent:

(a) A person who offers or sells a security in violation of this chapter, and who does not sustain the burden of proof that the person did not know and in the exercise of reasonable care could not have known of the violation, is liable to any other party to the transaction who did not knowingly participate in the violation or who did not have, at the time of the transaction, knowledge of the violation, who may sue either at law or in equity to rescind the transaction or to recover the consideration paid, together, in either case, with interest as computed in subsection (g)(1), plus costs, and reasonable attorney's fees, less the amount of any cash or other property received on the security upon the tender of the security by the person bringing the action or for damages if the person no longer owns the security. Damages are the amount that would be recoverable upon a tender less:

(1) the value of the security when the buyer disposed of the security; and

(2) the interest as computed in subsection (g)(1) on the value of the security from the date of disposition.

* * *

(c) A person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues analyses or reports concerning securities and:

(1) violates section 8, 12.1(b), or 14 of this chapter;

(2) employs a device, scheme, or artifice to defraud a person; or

(3) engages in an act that operates as would operate as fraud or deceit upon a person;

is liable to the other person, who may bring an action to recover any consideration paid for advice, any loss due to advice, interest at eight percent (8%) each year from the date consideration was paid, costs, and reasonable attorney's fees less the value of cash or property received due to the advice. It is a defense to an action brought for a violation of section 12.1(b) of this chapter that the person accused of the violation did not know of the violation and, exercising reasonable care, could not have known of the violation.

(d) A person who directly or indirectly controls a person liable under subsection (a), (b), or (c), a partner, officer, or director of the person, a person occupying a similar status or performing similar functions, an employee of a person who materially aids in the conduct creating the liability, and a broker-dealer or agent who materially aids in the conduct are also liable jointly and severally with and to the same extent as the person, unless the person who is liable sustains the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist. There is contribution as in cases of contract among the several persons liable.

Ind.Code § 23–2–1–19. The Floras contend that Poyser violated section 23–2–1–19 by selling securities without following the requirements of the Act, specifically that the VSCs were not registered as securities and Poyser was not registered as a seller of securities. In order to determine whether Poyser's actions violated the Act, we must first determine whether VSCs are investment contracts and thereby, whether they are securities.

■ When determining whether an instrument is a security, we turn first to Indiana Code section 23–2–1–1(k) for a definition of the term. Prior to March 2000, section 23–2–1–1(k) read:

"Security" means any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; commodity futures contract; option, put, call, privilege, or other right to purchase or sell a commodity futures contract; margin accounts for the purchase of commodities or commodity futures contracts; collateral-trust certificate; preorganization certificate or subscription; transferable share; investment contract; voting-trust certificate; certificate of deposit for a security; certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under such a title or lease; or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant, option, or right to subscribe to or purchase, any of the foregoing.

Ind.Code § 23–2–1–1(k). In March 2000, the Indiana Legislature amended section 23–2–1–1(k) to include a "viatical settlement contract [or] any fractional or pooled interest in a viatical settlement contract."

■ Therefore, a VSC is currently considered to be a security under section 23–2–1–1(k), but was not included in the definition of "security" at the time of the sale to the Floras. Thus, Poyser argues that VSCs were not securities at the time of the sale. However, literal inclusion in the statutory list of potential securities is not the test for a "security." *Am. Fletcher*

*Mortgage Co. v. U.S. Steel Credit Corp.*, 635 F.2d 1247, 1253 (7th Cir.1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1982, 68 L.Ed.2d 300 (1981) (applying Indiana law and noting the identical terms under the Securities Act of 1933, the Securities Exchange Act of 1934 and the Indiana "Blue Sky" Act). Whether a security is involved or not depends upon the economic realities of the transaction in light of Congressional intent. *Id.* (citing *United Housing Found. v. Forman*, 421 U.S. 837, 848, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975)). Accordingly, the relevant question is whether the VSCs sold by Poyser qualified as a security within the meaning of section 23–2–1–1(k) as it was written at the time of the sale. The Floras contend that the VSCs qualified under the general category of "investment contracts."

Following the holding of *Securities and Exch. Comm'n v. W.J. Howey Co.*, 328 U.S. 293, 301, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), as interpreted and applied in *American Fletcher Mortgage*, an "investment contract" arises whenever a person (1) invests money (2) in a common enterprise (3) premised upon a reasonable expectation of profits (4) to be derived from the entrepreneurial or managerial efforts of others. *American Fletcher Mortgage*, 635 F.2d at 1253. *See also Manns v. Skolnik*, 666 N.E.2d 1236, 1243 (Ind.Ct.App.1996), *trans. denied*, (stating that the *Howey* test is the test used in Indiana to determine whether a transaction is an investment contract).

### B. Application of the *Howey* Test to VSCs

There is no dispute that Poyser's viatical settlement sales involved the investment of money in a common enterprise or that the Floras invested their money with the reasonable expectation of profits. Therefore, when applying the *Howey* test to the case at hand, we focus on the fourth factor—whether the profits were to be derived from the entrepreneurial or managerial efforts of others.

Poyser relies heavily on *Securities and Exch. Comm'n v. Life Partners, Inc.*, 87 F.3d 536 (D.C.Cir.1996). In *Life Partners*, the D.C. Circuit held that the VSCs at issue were not investment contracts. *Id.* at 549. Applying the *Howey* test, the D.C. Circuit held that the VSCs involved an investment in a common enterprise with the reasonable expectation of making a profit. *Id.* at 542–45. However, the *Life Partners* court failed to find that the VSCs at issue were intended to generate a profit from the managerial efforts of others. *Id.* at 545.[2]

The *Life Partners* court focused on the pre- and post-purchase entrepreneurial activities of the sellers, noting that purely ministerial or clerical functions are not sufficient to be considered the managerial efforts of others. *Id.* (quoting *Securities and Exch. Comm'n v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 483 (5th Cir. 1974)). The court held that the managerial or entrepreneurial tasks of Life Partners occurred pre-purchase and that the post-purchase activities were purely ministerial and therefore, the VSCs at issue did not meet the third prong of the *Howey* test. *Id.* at 545–49.

The dissent in *Life Partners*, however, stated that the VSCs at issue met all of the

---

**2.** The *Life Partners* court noted that the original *Howey* test required that the profit be made "solely" from the efforts of others. 87 F.3d at 545 (quoting *Howey*, 328 U.S. at 298, 66 S.Ct. 1100). However, lower courts have given the Supreme Court's definition of a security broader sweep by requiring that profits be generated only "predominantly" from the efforts of others. *Id. See also, e.g., Goodman v. Epstein*, 582 F.2d 388, 408 n. 59 (7th Cir.1978), *cert. denied*, 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979).

prongs of the *Howey* test. *Id.* at 549–57 (Wald, J., dissenting). The dissent observed that the Supreme Court in *Howey* did not distinguish between pre- and post-purchase activities and stated that the third prong of the *Howey* test can be met by pre-purchase activities of a promoter when it is the success of these activities, either entirely or predominantly, that determines whether profits are eventually realized.[3] *Id.* at 551.

The Floras rely instead upon *Siporin v. Carrington*, 200 Ariz. 97, 23 P.3d 92 (Ct. App.2001), wherein the Arizona Court of Appeals held that the VSCs at issue were investment contracts and therefore, were securities under Arizona Securities Law. *Id.* at 96–98. The *Siporin* court was faced with an issue almost identical to ours today—whether the sale of VSCs constituted an investment contract under the definition of a "security" pursuant to Arizona Securities Law. After determining that the VSCs undisputedly involved the investment of money in a common enterprise, the court turned to whether the expectation of profits relied upon the efforts of others. *Id.* at 96.

The Arizona Court of Appeals noted that the profits the investors expected to realize depended almost entirely upon the purchaser's expertise in choosing which life insurance policies to purchase. *Id.* They relied upon the purchaser's ability to estimate the life expectancy of each prospective viator and obtaining expert medical assistance to evaluate each prospective viator's condition. *Id.* at 97. Additionally, the purchaser obligated itself to investigate the prospective viator's life insurance policy to determine the actual benefit payable and the likelihood it would be paid in full by ensuring the policy was not contestable on any ground and that it was assignable. *Id.*

After the analysis, the purchaser negotiated an advantageous price and marketed fractional interests in the policy to the general public, undertaking the premium payment and monitoring services to keep the policy in force and to timely claim the death benefit on behalf of the investors. *Id.* Although it is ultimately the death of the viator which yields the return on the investment, the court found that the profitability of the return depended almost exclusively upon the viatical seller's entrepreneurial pre-closing investigations, analyses, and negotiations in selecting the viator and the policy and in setting the terms on which the policy is purchased. *Id.* Because the success or failure of the enterprise rested with the purchaser, its agents and employees, and not with the investors, the court held that the VSCs qualified under the *Howey* test and therefore, were securities under the Arizona Securities Act. *Id.*

The *Siporin* court analyzed, and ultimately rejected, the *Life Partners* decision. *Id.* at 97–99. The court stated:

> *Life Partners* disregards the premise underlying the *Howey* test—that is, that the statutory definition of a "security" "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the

---

**3.** The dissent also pointed out that there have been occasions, albeit rare, when most of the significant managerial activities have occurred before purchase and a court has found *Howey*'s third prong satisfied. *Id.* at 553. Additionally, the dissent noted that there is no case on record holding that pre-purchase activities alone cannot satisfy *Howey*'s third prong. *Id.* Rather, the dissent notes that the decisions in the cases cited by the majority where the third prong was not satisfied appear to turn on the role that the market forces as opposed to the promoter's activities played in the realization of profits. *Id.*

use of the money of others on the promise of profits."

*Id.* at 98 (quoting *Howey,* 328 U.S. at 299, 66 S.Ct. 1100). The *Siporin* court stated that the rigidity of the bright-line rule contrasting pre- and post-purchase activities as developed by the D.C. Circuit in *Life Partners* contravened the policy identified in *Howey. Id.* Additionally, the court stated that neither *Howey* nor any federal securities decisions lend anything more than "tangential support" for the bright-line rule set forth in *Life Partners. Id.* Finally, the court noted that it was undisputed that the purchaser's efforts were the undeniably significant ones which affected the success or failure of the enterprise and therefore, the activities, albeit pre-sale, were sufficient to classify the transaction as an investment contract. *Id.*

In the present case, Poyser argues that, once the viaticals were in place, the only factor which determined the success of the investment was the date of death of the viator—an event over which neither Liberte nor Poyser held any control. However, we agree with the *Siporin* court that it was the activities by Liberte and Poyser which affected the success or failure of the enterprise, even if those activities may have been pre-purchase. The *Siporin* court noted:

> The mortality of the viator is merely another factor to be considered when the seller assembles a viatical settlement agreement that will, the parties hope, be

profitable for the investor upon the inevitable death of the viator. What truly determines viatical settlement profitability is the realization, over time, of an outcome predicated by the seller through its analyses of the viator's life expectancy, the soundness of the insurer, the actions needed to keep the policy in effect for the original face amount and the insurer's unconditional liability under the policy's terms.

*Id.* at 99.

The Floras were solicited and invested funds with Liberte in December 1997. Appellant's Appendix at 99–101. The Agency Agreement reflected what Liberte would do *in the future* to locate, evaluate and create the specific viaticals for the Floras. *Id.* at 117–26.[4] When the specific viatical documentation arrived, the documents showed that the viators had entered into VSCs only in the fall of 1998. *Id.* at 133–41.

Therefore, we hold that the VSCs sold by Liberte and Poyser to the Floras were investment contracts under the definition of "security" in section 23–2–1–1(k) of the Act.[5]

### III.  Vagueness of Indiana Code section 23–2–1–1(k)

Additionally, Poyser raises the argument that section 23–2–1–1(k) is unconstitutionally vague. A statute is unconstitutionally vague if the prohibitions are not clearly defined. *Helton v. State,* 624

---

**4.** The Floras contend, and we agree, that even the majority in *Life Partners* would find the VSCs at issue in the case at hand to be investment contracts as all of the managerial and entrepreneurial activities occurred after the investment.

**5.** As discussed above, the Indiana legislature amended the definition of "security" in March 2000 to include "viatical settlement contract [or] any fractional or pooled interest in a viatical settlement contract." As we hold

today that the VSCs at issue were "investment contracts" under the definition of "security" before the amendment, we find it unnecessary to rehash the common debate in statutory interpretation cases concerning whether this amendment constituted a change in the law or a clarification of prior legislative intent. The amendment confirms, however, the long-standing policy of our legislature to protect the investing public.

N.E.2d 499, 505 (Ind.Ct.App.1993), *trans. denied, cert. denied,* 520 U.S. 1119, 117 S.Ct. 1252, 137 L.Ed.2d 333 (1997) (citing *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)). On the contrary, a statute is not void for vagueness if individuals of ordinary intelligence would comprehend it to fairly inform them of the generally proscribed conduct. *Id.* Poyser's argument is simply that this litigation would not exist if the statute were not impermissibly vague. However, we find this argument unconvincing.[6] The mere existence of a lawsuit over a definition does not render that definition impermissibly vague.[7]

### IV.  Genuine Issues of Material Fact

■  Finally, Poyser argues that the trial court erred in granting the Floras' Motion for Summary Judgment because genuine issues of material fact remain. First, he raises the issue of whether he knew or could have known that his sale of VSCs to the Floras constituted a violation of the Act.[8] However, in *Arnold v. Dirrim,* 398 N.E.2d 426 (Ind.Ct.App.1979), this court analyzed an assertion that a seller did not know that his activities were a violation of the Act. We noted:

> Actually, the bulk of Arnold's argument focuses not on his lack of knowledge about the facts but rather that he was unaware the law attached significance to those facts.... These assertions miss the mark. The [Act] imposes liability on those who know the applicable facts without regard to their knowledge of the law.

*Id.* at 435. Poyser does not contend that he was unaware of the facts surrounding the transaction, merely that he was unaware that the law attached any regulations to the facts as they existed. This does not constitute an affirmative defense under section 23–2–1–19.

■  Second, Poyser argues that a genuine issue of material fact remains regarding when the Floras had knowledge of Poyser's violation of the Act. Section 23–2–1–19(g) provides that an action brought under section 23–2–1–19 must be "commenced within three (3) years after discovery by the person bringing the action...." Poyser contends that it is unclear when the Floras became aware that the VSCs were "investment contracts" and, thus

---

**6.** Although we have not examined the vagueness of the term "investment contract," other courts have rendered opinions on the vagueness of this term. See, e.g., *Securities and Exch. Comm'n v. Brigadoon Scotch Distrib. Co.,* 480 F.2d 1047, 1052 n. 6 (2d Cir.1973), *cert. denied,* 415 U.S. 915, 94 S.Ct. 1410, 39 L.Ed.2d 469 (1974) (noting that, in light of the many Supreme Court decisions defining and applying the term "investment contract," an argument that the term is impermissibly vague is untenable).

**7.** Additionally, Poyser argues that he should not have been required to comply with the Act because he complied with the regulations issued by the Indiana Department of Insurance. However, his argument relies on the premise that this court will hold that only the amended version of section 23–2–1–1(k) included VSCs. Rather, we hold today that the term

"investment contracts" was broad enough to include VSCs, so Poyser's argument that he should not have been required to comply with the Act is misplaced.

**8.** Poyser also argues that a genuine issue of material fact remains as to whether the actions of Poyser and Liberte were pre- or post-purchase. He argues that the pre-purchase activities may not satisfy the third prong of the *Howey* test and, therefore, a genuine issue of material fact exists. We decline to extend the distinction between pre- and post-purchase activities as designated by the *Life Partners* court. Such a distinction was not part of the original *Howey* test and we have been unable to find any court besides the *Life Partners* court which has set forth such a distinction. Therefore, Poyser's argument is unfounded.

were "securities" under the Act. The Floras testified in their affidavits that they were unaware that the VSC sales constituted a violation of the Act until May 2001 when they consulted legal counsel. Appellant's Appendix at 102. Poyser has failed to produce any evidence to the contrary. Poyser's only cogent argument is that the Floras may have been aware of the violation due to a June 6, 2000, letter which Liberte sent to the Floras. Assuming arguendo that the letter made the Floras aware of a violation, they commenced their suit on July 3, 2001, which is clearly within the three-year discovery-based statute of limitations. Therefore, we find that no genuine issue of material fact exists as to the date that the Floras had knowledge of the violation of the Act.

### Conclusion

The VSCs at issue fall under the category of "investment contract" when analyzed under the United States Supreme Court's *Howey* test. Therefore, they were securities even before the Indiana legislature specifically added them to the enumerated list contained in the Act. Additionally, merely asserting that a definition must be vague or the present lawsuit would not exist is insufficient to challenge the vagueness of a term. Finally, because no genuine issues of material fact exist, the trial court properly granted the Floras' Motion for Summary Judgment.

Affirmed.

RILEY and MATTINGLY–MAY, JJ., concur.