**SECURITY TRUST CORPORATION, Ambassador Financial Group, Inc., and Michael E. Ramer, Appellants,**

v.

**ESTATE OF Robert R. FISHER, by Barbara ROY, Personal Representative, Appellee.**

**No. 02A03–0210–CV–353.**

Court of Appeals of Indiana.

Oct. 16, 2003.

George Sistevaris, Haller & Colvin, P.C., Fort Wayne, IN, Jonathan J. Myers, Myers Tison Hockemeyer & McNagny, Columbia City, IN, Attorneys for Appellants.

Michael H. Michmerhuizen, Barrett & McNagny LLP, Fort Wayne, IN, Attorney for Appellee.

## OPINION

MATHIAS, Judge.

Robert Fisher ("Fisher") purchased a viatical settlement from Michael Ramer, an agent of Security Trust Corporation and Ambassador Financial Group (collectively "Ramer"). Fisher filed a complaint against Ramer in Allen Superior Court alleging in pertinent part that the viatical settlement is a "security" as that term is defined in the Indiana Securities Act, and that Ramer offered and sold an unregistered security in violation of that Act. Fisher later filed a motion for partial summary judgment arguing that the viatical settlement at issue is a "security." Ramer then filed a cross motion for partial summary judgment. The trial court granted

Fisher's motion for partial summary judgment, and denied Ramer's motion. Ramer has filed this interlocutory appeal raising four issues, which we restate as the following three:

I. Whether viatical settlements were subject to the Indiana Securities Act at the time of sale to Fisher;

II. Whether the viatical settlement at issue is an "investment contract" as that term is interpreted under the Indiana Securities Act; and

III. Whether Indiana Code section 23–2–1–1(k) is unconstitutional as applied to Ramer.

Concluding that the trial court properly granted Fisher's motion for partial summary judgment, we affirm.

**Facts and Procedural History**

On or about July 27, 1998, Ramer sold a viatical settlement to Fisher. Generally, under the terms of a viatical settlement contract, an investor acquires an interest in the life insurance policy of a terminally ill patient at a discount of twenty to forty percent, depending upon the insured's life expectancy. The investor receives the benefit of the insurance upon the insured's death, and his profit is measured by the difference between the discounted price paid to the insured and the death benefit collected from the insurer, less certain costs, premiums, and expenses.[1] The viatical settlement sold to Fisher represented a 0.5303% interest in the Banner Life Insurance Policy of Kenneth Lowry. The "overall return" of the viatical settlement was dependent upon Lowry's projected life expectancy. The viatical settlement sold to Fisher was not registered as a security.

On July 17, 2001, Fisher[2] filed a complaint against Ramer in Allen Superior Court alleging in pertinent part that Ramer offered and sold an unregistered security in violation of the Indiana Securities Act, and that Fisher is entitled to rescission of the viatical settlement contract. Appellant's App. pp. 69–75. On December 14, 2001, Fisher filed a motion for partial summary judgment arguing that the viatical settlement was a security as that term is defined in the Indiana Securities Act. Appellant's App. pp. 86–104. On that same date, Ramer filed a cross motion for partial summary judgment. In that motion, Ramer noted that the General Assembly amended the Act in 2000 to include viatical settlements within the definition of the term "security." Ramer therefore argued that the viatical settlement sold to Fisher in 1998 was not a "security" as that term was defined in the Act at the time of sale. Appellant's App. pp. 196–218.

A hearing was held on the parties' motions for partial summary judgment on January 31, 2002. On June 18, 2002, the trial court issued the following order:

> [T]he Court now GRANTS [Fisher's] Motion for Partial Summary Judgment, concluding that the viatical settlement in question in this cause of action is a security under the Indiana Securities Act. The Court DENIES [Ramer's] Motion for Partial Summary Judgment.

Appellant's App. pp. 8–9. The trial court also rejected Ramer's general assertion that he did not take part in any activities designed to generate profit. *Id.* Ramer subsequently filed a motion for certification of interlocutory appeal, which the trial court granted on September 16, 2002. Our

---

1. *See Poyser v. Flora*, 780 N.E.2d 1191, 1192 n. 1 (Ind.Ct.App.2003).

2. Fisher died prior to the commencement of this litigation, and his estate, by personal representative Barbara Roy (referred to herein as "Fisher") initiated this action.

court accepted jurisdiction of this appeal on December 16, 2002.

## Standard of Review

■ Our standard of review of a summary judgment motion is the same standard used in the trial court:

> Summary judgment is appropriate only where the evidence shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. All facts and reasonable inferences drawn from those facts are construed in favor of the non-moving party. The review of a summary judgment motion is limited to those materials designated to the trial court. We must carefully review decisions on summary judgment motions to ensure that the parties were not improperly denied their day in court.

*Tom–Wat, Inc. v. Fink*, 741 N.E.2d 343, 346 (Ind.2001) (citations omitted). "A party seeking summary judgment bears the burden of showing the absence of a factual issue and his entitlement to judgment as a matter of law." *Harco, Inc. of Indianapolis v. Plainfield Family Dining Assoc.*, 758 N.E.2d 931, 937 (Ind.Ct.App.2001) (citation omitted). All pleadings, affidavits, and testimony are construed liberally and in the light most favorable to the nonmoving party. *May v. Frauhiger*, 716 N.E.2d 591, 594 (Ind.Ct.App.1999). Our standard of review is not altered by cross motions for summary judgment. *Ind. Ins. Co. v. Am. Cmty. Servs., Inc.*, 718 N.E.2d 1147, 1152 (Ind.Ct.App.1999).

## I. Effect of the 2000 Amendment to Indiana Securities Act

■ Ramer argues that "[a]t the time the Viatical Settlement was sold to Fisher, Viatical Settlements were not included in the definition of 'securities' and, therefore, under the applicable rules of statutory construction, were not subject to [the Indiana Securities Act]." Br. of Appellant at 9. The interpretation of a statute is a question of law reserved for the courts. *Raab v. Town of Schererville*, 766 N.E.2d 790, 792 (Ind.Ct.App.2002), *trans. denied*. We review questions of law under a de novo standard, and we owe no deference to a trial court's legal conclusions. *Id.*

The term "security" is defined in Indiana Code section 23–2–1–1(k), and prior to March 2000, that section provided:

> "Security" means any note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; commodity futures contract; option, put, call, privilege, or other right to purchase or sell a commodity futures contract; margin accounts for the purchase of commodities or commodity futures contracts; collateral-trust certificate; preorganization certificate or subscription; transferable share; investment contract; voting-trust certificate; certificate of deposit for a security; certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under such a title or lease; or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant, option, or right to subscribe to or purchase, any of the foregoing.

Ind.Code § 23–2–1–1(k) (1989 & Supp. 2002). In March 2000, the General Assembly amended section 23–2–1–1(k) to include a "viatical settlement contract [or] any fractional or pooled interest in a viatical settlement contract."

In *Poyser v. Flora*, 780 N.E.2d 1191 (Ind.Ct.App.2003), Poyser, a licensed life insurance agent for Liberte Capital Group

sold a viatical settlement to the Floras. *Id.* at 1192. The Floras later filed suit against Poyser alleging that Poyser's sale of the viatical settlement violated the Indiana Securities Act because the viatical settlement was not a registered security and Poyser was not registered as an agent. *Id.* The Floras filed a motion for summary judgment, which was granted. *Id.* Poyser appealed and raising exactly the same argument presented in this case, argued that viatical settlements were not included under the definition of "security" at the time of the sale and were therefore not required to be registered as securities. *Id.* at 1194. The Floras contended that although viatical settlements were not included in the statutory definition at the time of the sale, they qualified as securities under the general category of "investment contracts." *Id.* at 1195.

Our court observed that "literal inclusion in the statutory list of potential securities is not the test for a 'security.'" *Id.* at 1194. We then analyzed the viatical settlement contract under the test established in *Securities and Exchange Commission v. W.J. Howey Co.,* 328 U.S. 293, 301, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). *Id.* at 1195. Applying the *Howey* test, we held that the viatical settlement was an "investment contract," which qualified as a security pursuant to Indiana Code section 23–2–1–1(k). *Id.* at 1197. We also noted:

> As discussed above, the Indiana legislature amended the definition of "security" in March 2000 to include "viatical settlement contract [or] any fractional or pooled interest in a viatical settlement contract." As we hold today that the VSCs at issue were "investment contracts" under the definition of "security" before the amendment, we find it unnecessary to rehash the common debate in statutory interpretation cases concerning whether this amendment constituted a change in the law or a clarification of

> prior legislative intent. The amendment confirms, however, the long-standing policy of our legislature to protect the investing public.

*Id.* at 1197 n. 5. In light of this language, Ramer contends that "statutory construction is a critical issue in interpreting the definition of 'security' as it concerns Viatical Settlements," and requests that our court "give it fair and thorough consideration." Br. of Appellant at 10. We are happy to oblige.

■■■ "Our main objective in statutory construction is to determine, effect and implement the intent of the legislature." *Melrose v. Capitol City Motor Lodge, Inc.,* 705 N.E.2d 985, 989 (Ind.1998). Further, in interpreting a statute, we will read the statute as a whole, attempting to give effect to all provisions so that no section is held meaningless if it can be reconciled with the rest of the statute. *Citizens Action Coalition of Ind., Inc. v. Ind. Statewide Ass'n of Rural Elec. Coops., Inc.,* 693 N.E.2d 1324, 1327 (Ind.Ct.App.1998). A fundamental rule of statutory construction is that "an amendment changing a prior statute indicates a legislative intention that the meaning of the statute has changed." *United Nat'l Ins. Co. v. DePrizio,* 705 N.E.2d 455, 460 (Ind.1999). "Such an amendment raises the presumption that the legislature intended to change the law unless it clearly appears that the amendment was passed in order to express the original intent more clearly." *Id.*

■■■ On the other hand, the General Assembly's amendment of a statute may also be indicative of its intent at the initial enactment of the statute. *Tedlock v. State,* 656 N.E.2d 273, 276 (Ind.Ct.App.1995) (citing *Am. Underwriters Group v. Williamson,* 496 N.E.2d 807, 809 (Ind.Ct.App. 1986)). "In amending an act, the legislature is presumed to have in mind the

history of the act and the decisions of the courts on the subject matter of the legislation being construed." *Stith v. State,* 766 N.E.2d 1266, 1268 (Ind.Ct.App.2002) (citing *Egan v. Bass,* 644 N.E.2d 1272, 1274 (Ind.Ct.App.1994)).

◼ Ramer urges our court to apply the "long-standing principle of statutory construction *expressio unius est exclusio alterius,*" which means the enumeration of certain things in a statute necessarily implies the exclusion of all others. Br. of Appellant at 11; *T.W. Thom Constr., Inc. v. City of Jeffersonville,* 721 N.E.2d 319, 325 (Ind.Ct.App.1999). "The maxim is to be used only as an aid in arriving at the legislative intent." *Brown v. State,* 774 N.E.2d 1001, 1006 (Ind.Ct.App.2002), *trans. denied* (citing *Sue Yee Lee v. Lafayette Home Hosp., Inc.,* 410 N.E.2d 1319, 1324 (Ind.Ct.App.1980)). However, it will not be followed blindly with the effect of overriding or defeating clear legislative intent. *Id.* Our courts have also indicated that "this maxim may be persuasive in a doubtful case but it is not conclusive." *Id.*

◼ Even after full and complete consideration of Ramer's argument, we remain unpersuaded. Section 23–2–1–1(k) does not provide an exhaustive list, but merely an illustrative list of those items that can be considered "securities." As we noted above, "literal inclusion in the statutory list of potential securities is not the test for a 'security.'" *Poyser,* 780 N.E.2d at 1194 (citing *Am. Fletcher Mortgage Co. v. U.S. Steel Credit Corp.,* 635 F.2d 1247, 1253 (7th Cir.1980), *cert. denied* ). *See also Szpunar v. State,* 783 N.E.2d 1213, 1219–20 (Ind.Ct.App.2003) ("The term 'security' is defined in Indiana Code section 23–2–1–1(k); however, this definition is not comprehensive and is subject to interpretation."). Further, the *Howey* court explained that the term "security" "embodies a flexible rather than a static principle, one

that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." 328 U.S. at 299, 66 S.Ct. 1100. Indeed, such flexibility is crucial as one considers the financial ruin that has been and may be caused by newly created and previously unknown investment and accounting devices.

Ramer also argues that the General Assembly's 2000 amendment of section 23–2–1–1 to include viatical settlements indicates that the General Assembly intended to change the law rather than clarify the existing law. Specifically, Ramer asserts that if the 2000 amendment had stated

> "securities are defined as investment contracts, *which include* viatical settlement contracts," then one could argue that the amendment clarified the existing law. The amendment was not, however, expressed this way. The March 17, 2000 amendment, instead added Viatical Settlements as a new type of security, separate and apart from the other types of securities enumerated in the Act, including investment contracts.

Br. of Appellant at 12–13 (emphasis in original).

In further support of this argument, Ramer relies on the 2000 amendment adding section 23–2–1–1(t), which provides in pertinent part that the term viatical settlement does not include "[a]n agreement by a person who enters into not more than one (1) such agreement in any five (5) year period to purchase a life insurance policy or contract for the transfer of a life insurance policy for a value that is less than the expected death benefit." Ind.Code § 23–2–1–1(t) (1989 & Supp.2002). Ramer contends that if viatical settlements could qualify as investment contracts, and therefore as securities under the Act prior to the 2000 amendment, then presumably

those viatical settlements exempted under section 23–2–1–1(t) "may still be argued to fall within the definition of 'investment contracts'" and "one might still have standing to sue under this definition in order to vacate the contract and seek relief under the Act." Br. of Appellant at 14.

In making this argument, however, Ramer urges an interpretation of the term "security" that is static, as opposed to flexible. In addition, Ramer's interpretation would likely render that part of the statute defining a security as "an investment contract" nearly meaningless, which is contrary to our principles of statutory construction. Further, interpreting the Act as Ramer suggests would be contrary to the Act's purpose of protecting "the public by preventing dishonest promoters from selling financial schemes to unwary investors who have little or no knowledge of the realistic likelihood of the success of their investments." *See Poyser*, 780 N.E.2d at 1193. Accordingly, we conclude that the 2000 amendment to the Act did not have the effect of changing the law, but merely clarified the existing law. For all these reasons, a viatical settlement sold prior to that amendment may qualify as a security if the requirements of the *Howey* test are satisfied.

## II. The *Howey* Test

■ Ramer next argues that the viatical settlement in this case is not an investment contract. Specifically, he contends that Fisher failed to present sufficient evidence to satisfy the *Howey* test, or in the alternative, that the evidence presented in this case demonstrates that the viatical settlement at issue was not an "investment contract." Fisher relies on our court's decision in *Poyser* in asserting that the

viatical settlement is an "investment contract."

■ As we stated above, in *Poyser* we analyzed the viatical settlement contract under the test established in *Howey* and held that the viatical settlement was an "investment contract." *Poyser*, 780 N.E.2d at 1197. Pursuant to the *Howey* test, "an 'investment contract' arises whenever a person (1) invests money (2) in a common enterprise (3) premised upon a reasonable expectation of profits (4) to be derived from the entrepreneurial or managerial efforts of others." *Id.* (citing *Am. Fletcher Mortgage Co.*, 635 F.2d at 1253). *See also Manns v. Skolnik*, 666 N.E.2d 1236, 1243 (Ind.Ct.App.1996), *trans. denied* (observing that Indiana courts apply the *Howey* test when called upon to determine whether a transaction is an investment contract).

In *Poyser*, after noting that "[t]here is no dispute that Poyser's viatical settlement sales involved the investment of money in a common enterprise or that the Floras invested their money with the reasonable expectation of profits," we focused our analysis on the fourth factor, i.e. "whether the profits were to be derived from the entrepreneurial or managerial efforts of others." 780 N.E.2d at 1195. With regard to that factor, Poyser asserted that the success of the investment was solely determined by the date of death of the viator, an event over which he had no control; therefore, the Floras could not satisfy the last prong of the *Howey* test. *Id.* at 1197.

In rejecting that argument,[3] our court acknowledged a decision from the Arizona

---

**3.** In support of his argument, Poyser relied heavily on *Securities and Exchange Commission v. Life Partners, Inc.*, 87 F.3d 536 (D.C.Cir.1996). In that case, the D.C. Circuit

held that the viatical settlement contracts at issue were not investment contracts because although the viatical settlements involved an investment in a common enterprise premised

Court of Appeals in which that court stated:

> "The mortality of the viator is merely another factor to be considered when the seller assembles a viatical settlement agreement that will, the parties hope, be profitable for the investor upon the inevitable death of the viator. What truly determines viatical settlement profitability is the realization, over time, of an outcome predicated by the seller through its analyses of the viator's life expectancy, the soundness of the insurer, the actions needed to keep the policy in effect for the original face amount and the insurer's unconditional liability under the policy's terms."

*Id.* at 1197 (quoting *Siporin v. Carrington,* 200 Ariz. 97, 23 P.3d 92, 99 (Ct.App.2001), *review denied*). We then concluded that the viatical settlement sold to the Floras was an investment contract, based on the following facts: 1) the Floras were solicited and invested funds with Liberte Capital Group in 1997; 2) "the Agency Agreement reflected what Liberte would do *in the future* to locate, evaluate and create the specific viaticals for the Floras;" and 3) the documentation concerning the transaction demonstrated that the viators entered into viatical settlement contracts in the fall of 1998. *Id.* (emphasis in original).

Ramer argues that unlike the facts in *Poyser,* in this case, no evidence was designated to the trial court "which shows what occurred or what contractual promises were made to Fisher." Br. of Appellant at 16. Ramer contends that the evidence presented reveals that he played a "very limited and strictly ministerial role," and in making that argument, relies on statements he made in his own affidavit. Br. of Appellant at 21. Further, although we rejected the argument in *Poyser,* Ramer continues to assert that the success of the investment was solely determined by the date of death of the viator, an event over which he had no control.

In support of its summary judgment motion, the Fisher estate submitted a brochure from American Benefits Group describing viatical settlements and an investor's expected return and two letters from American Benefits Group to Fisher discussing his purchase of the viatical settlement. Both letters were carbon copied to Michael Ramer, who was listed as the "agent of record." [4] The first letter, dated August 3, 1998, (approximately one week after Ramer sold the viatical settlement to Fisher) indicated that American Benefits Group would begin to allocate Fisher's funds upon receipt and would then compile his "Viatical Package." Appellant's App. p. 121. The second letter, dated

---

upon a reasonable expectation of profits, they were not intended to generate a profit from the managerial efforts of others. *Id.* at 542–45. Specifically, the *Life Partners* court concluded that the managerial or entrepreneurial tasks performed by Life Partners occurred pre-purchase and any post-purchase activities were purely ministerial. *Id.* at 545–49. In *Siporin v. Carrington,* the Arizona Court of Appeals rejected the *Life Partners* decision stating that "the rigidity of the bright-line rule contrasting pre- and post-purchase activities as developed by the D.C. Circuit in *Life Partners* contravened the policy identified in *Howey.*" *Poyser,* 780 N.E.2d at 1197 (citing *Siporin,* 200 Ariz. 97, 23 P.3d 92, 98 (Ct.App.

2001), *review denied*). The *Siporin* court also observed that the purchaser's significant efforts affected the success or failure of the enterprise, and even though the activities occurred pre-sale, they were sufficient to classify the transaction as an investment contract. *Siporin,* 23 P.3d at 98.

4. The letters actually state that they were carbon copied to "Ambassador Financial Group/Michael Fisher/Agent of Record." Appellant's App. pp. 121–22. We assume "Michael Fisher" is a scrivener's error and the letters were actually copied to Michael Ramer.

September 18, 1998, informed Fisher that "a suitable policy has been located for your investment into a viatical settlement." Appellant's App. p. 122. The letter then describes Fisher's projected return on the investment. *Id.* Fisher also submitted a copy of the August 3, 1998 agreement assigning Kenneth Lowry's life insurance policy to National Viatical Trust c/o Portsmouth Settlement Company I, Inc. Appellant's App. p. 76.

While we agree with Ramer that the death of the viator ultimately determines the return on the investment, the profitability of the return is dependent upon others to analyze and select the viator and policy and to establish the terms under which the policy is purchased. Similar to those circumstances in *Poyser* and *Siporin*, it is apparent in this case that the success of the viatical settlement investment was dependent upon Ramer's and/or American Benefits Group's expertise in choosing which life insurance policy to purchase.[5]

> What truly determines viatical settlement profitability is the realization, over time, of an outcome predicted by the seller through its analyses of the viator's life expectancy, the soundness of the insurer, the actions needed to keep the policy in effect for the original face amount, and the insurer's unconditional liability under the policy's terms.

**5.** It is undisputed that Ramer sold the viatical settlement representing an interest in Kenneth Lowry's life insurance policy to Fisher; however, after reviewing the record in this case, we are unable to determine exactly what efforts American Benefits Group undertook in this transaction.

**6.** Ramer also contends that genuine issues of material fact exist concerning whether the viatical settlement contract qualifies as an investment contract under the *Howey* test. We disagree. As discussed above, Ramer's

*See Siporin,* 23 P.3d at 99. For all these reasons, we conclude that the viatical settlement sold to Fisher in this case was an investment contract and therefore qualified as a security under Indiana Code section 23–2–1–1(k).[6] Further, our conclusion is consistent with the Act's stated purpose of protecting the investing public.

### III. Constitutional Concerns

 Finally, Ramer argues the trial court's order granting Fisher's motion for summary judgment results in an improper retroactive application of the Indiana Securities Act to the viatical settlement contract, in violation of the Indiana and United States Constitutions,[7] which prohibit the passage of ex post facto laws. Specifically, Ramer contends that Fisher's claims against Ramer

> are based upon a Viatical Settlement which was finalized and vested long before the March 2000 change heralded a change in the procedure relating to the sale of such contracts. The law is [sic] it existed on July 27, 1998 must govern this transaction. To decide otherwise would expose Security Trust, Ambassador, and Ramer to retroactive punishment for a change in the law occurring after the act in question.

Br. of Appellant at 26. Contrary to this argument, in determining that the viatical settlement contract at issue is an investment contract, which therefore qualifies as a "security," we interpreted Indiana Code

sale of the viatical settlement to Fisher, as well as the brochure and letters submitted to the trial court demonstrate the efforts which were undertaken to secure the investment for Fisher and are sufficient to support our conclusion that the viatical settlement contract transaction meets requirements of the *Howey* test.

**7.** *See* Ind. Const. Art. I, § 24; U.S. Const. Art. I, § 10.

section 23–2–1–1(k) as it existed on July 27, 1998, the date of sale of the contract. This interpretation does not constitute a constitutionally prohibited retroactive application of the Act.

Ramer also argues that Indiana Code section 23–2–1–1(k) is unconstitutionally vague because "the term 'investment contract,' and statutory definitions containing that term with respect to 'securities,' is unconstitutionally vague as applied to Viatical Settlements." Br. of Appellant at 28. However, our court has already considered and rejected this same argument. In *Poyser* we noted, "the mere existence of a lawsuit over a definition does not render that definition impermissibly vague." 780 N.E.2d at 1198.

### Conclusion

The March 2000 amendment to Indiana Code section 23–2–1–1(k) constitutes a clarification of the existing law and any viatical settlement contract sold after that amendment qualifies as a "security." After applying the *Howey* test, we conclude that the viatical settlement at issue in this case was an investment contract; consequently, it qualified as a security pursuant to Indiana Code section 23–2–1–1(k). Further, Indiana Code section 23–2–1–1(k) is not unconstitutional as applied to Ramer. The trial court therefore did not err when it granted Fisher's motion for partial summary judgment.

Affirmed.

NAJAM, J., and ROBB, J., concur.