[This opinion has been published in *Ohio Official Reports* at 74 Ohio St.3d 495.]

IN RE COLUMBUS SKYLINE SECURITIES, INC. ET AL.: HOLDERMAN, COMMR.,
APPELLANT, *v.* COLUMBUS SKYLINE SECURITIES, INC., ET AL., APPELLEES.

[Cite as *In re Columbus Skyline Securities, Inc.*, 1996-Ohio-151.]

*Corporations—Securities—R.C. 1707.01(J) gives intrastate securities dealers adequate notice that federal law may be applied to calculate current market price of over-the-counter stock to determine fraudulent conduct.*

R.C. 1707.01(J) provides constitutionally adequate notice that federal law may be applied to the conduct of licensed intrastate securities dealers for the purpose of calculating the current market price of over-the-counter securities and determining fraudulent conduct.

(No. 94-1445—Submitted October 10, 1995—Decided February 14, 1996.)

APPEAL from the Court of Appeals for Franklin County, No. 93AP-790.

_____

{¶ 1} Appellee Columbus Skyline Securities, Inc. ("Skyline") is a securities dealer based in Ohio. Appellant, Commissioner of the Ohio Division of Securities ("Division"), revoked Skyline's administrative license, and the licenses of its president and six of its sales staff, based on alleged fraudulent conduct concerning the intrastate sale of the over-the-counter common stock of FiberCorp International, Inc. ("FiberCorp") in violation of R.C. 1707.44(G).

{¶ 2} In revoking the licenses, the Division examined sales confirmations issued by Skyline to its retail customers. The records show that from late December 1990 to mid-March 1991, Skyline sold over 135,000 shares of FiberCorp common stock to the general public at a price of $1.00 per share. During this same time, Skyline purchased 503,957 shares of FiberCorp for a price ranging between $.15 and $.20 per share in a series of transactions with an SEC-registered dealer. Skyline

never disclosed to retail investors, who were charged $1.00 per share, the $.15 to $.20 purchase prices.

{¶ 3} The Division also examined the price at which Skyline sold FiberCorp shares to other securities dealers. Between January 1991 and March 1991, Skyline sold 57,000 shares of FiberCorp to another intrastate securities dealer at a price of $.25 per share, while selling over 22,000 shares of FiberCorp to Ohio retail investors at $1.00 per share. Skyline again failed to disclose to its retail investors the existence of the $.25 per share dealer-to-dealer sales.

{¶ 4} Based on its calculations of current market price ("CMP") for FiberCorp common stock, the Division in effect determined that Skyline sold FiberCorp securities to Ohio retail investors at prices up to 567 percent higher than the price at which Skyline was able to purchase the stock from an interstate over-the-counter securities dealer, and up to 300 percent higher than the price at which Skyline sold FiberCorp to another intrastate securities dealer. Moreover, Skyline did not inform its investors of this price disparity.

{¶ 5} The Division alleged that Skyline violated R.C. 1707.44(G) by selling FiberCorp common stock at an excessive price that bore no reasonable relationship to the market price of the issued stock. The Division contended that R.C. 1707.01(J) allowed it to apply both federal and state case law for the purpose of determining whether the conduct of Skyline was fraudulent. Skyline disagreed with the methods used by the Division to calculate the current market price of the FiberCorp stock, arguing that R.C. 1707.01(J) failed to give adequate notice as to what standard would be applied in calculating the current market price of an over-the-counter security.

{¶ 6} The trial court affirmed the license revocation action as being supported by reliable, probative, and substantial evidence and in accordance with law. The Tenth District Court of Appeals reversed the trial court, however, holding that the Ohio Securities Act ("Act") and its companion rules were

2

unconstitutionally vague because the Act did not give sufficient notice to Skyline that the Division may define fraud using federal law.

**{¶ 7}** This cause is now before this court pursuant to the allowance of a discretionary appeal.

_____

*Betty D. Montgomery,* Attorney General, and *Daniel A. Malkoff*, Assistant Attorney General, for appellant.

*Lyman Brownfield*, for appellees.

*Albert L. Bell*, *Eugene P. Whetzel* and *Howard M. Friedman*, urging reversal for *amicus curiae,* Ohio State Bar Association.

_____

**MOYER, C.J.**

**{¶ 8}** This case presents the court with the issue of whether R.C. 1707.01(J) gives intrastate securities dealers adequate notice that federal case law may be applied to calculate the current market price of over-the-counter stock to determine if the conduct of a dealer is fraudulent. For the following reasons, we answer that question in the affirmative.

**{¶ 9}** R.C. 1707.44(G), at the time relevant herein, provided that "[n]o person in selling securities shall knowingly engage in any act or practice which is, in sections 1707.01 to 1707.45 of the Revised Code, declared illegal, defined as fraudulent, or prohibited." The definition for "fraud" as used in the Act is found in R.C. 1707.01(J), which provides:

"'Fraud,' 'fraudulent acts,' 'fraudulent practices,' or 'fraudulent transactions' means *anything recognized* on or after July 22, 1929, as such *in courts of law or equity*; any device, scheme, or artifice to defraud or to obtain money or property by means of any false pretense, representation, or promise; any fictitious or pretended purchase or sale of securities; and any act, practice, transaction, or

course of business relating to the sale of securities which is fraudulent or which has operated or would operate as a fraud upon the purchaser." (Emphasis added.)

{¶ 10} The court of appeals below held R.C. 1707.01(J) to be unconstitutionally void for vagueness. The court determined that Skyline had inadequate notice that federal securities law standards used in calculating current market price could be applied in enforcing Ohio securities law. Moreover, it held that "[a] general rule stating that federal securities law applies to Ohio intrastate securities trading would be insufficient as it would be impossible for anyone to know what standard applied." Consequently, the appellate court reversed the judgment of the trial court and remanded the case because, in its view, the Division's calculations in determining current market price based on federal law could not be used to support the charges brought against Skyline without violating substantive due process. We disagree.

{¶ 11} It is well established that all legislative enactments enjoy a strong presumption of constitutionality, and that any assertion of unconstitutionality must be proved beyond a reasonable doubt by the challenging party. *State v. Collier* (1991), 62 Ohio St.3d 267, 269, 581 N.E.2d 552, 553. Moreover, in order to prove that a statute is unconstitutionally vague, "the challenger must show that upon examining the statute, an individual of ordinary intelligence would not understand what he is required to do under the law." *State v. Anderson* (1991), 57 Ohio St.3d 168, 171, 566 N.E.2d 1224, 1226.

{¶ 12} The Ohio Securities Act, generally referred to as Ohio Blue Sky Law, was adopted on July 22, 1929 to prevent the fraudulent exploitation of the investing public through the sale of securities. *United States. v. Tehan* (C.A.6, 1966), 365 F.2d 191, 194. See, also, *Hall v. Geiger-Jones Co.* (1917), 242 U.S. 539, 37 S.Ct. 217, 61 L.Ed. 480, upholding the constitutional validity of the former Ohio Blue Sky Law in regulating the sale of all securities. Many of the enacted statutes are remedial in nature, and have been drafted broadly to protect the

investing public from its own imprudence as well as the chicanery of unscrupulous securities dealers. See *Bronaugh v. R. & E. Dredging Co.* (1968), 16 Ohio St.2d 35, 45 O.O.2d 321, 242 N.E.2d 572. In order to further the intended purpose of the Act, its securities anti-fraud provisions must be liberally construed.

{¶ 13} The plain language of R.C. 1707.01(J) defines "fraud," in part, as "anything recognized *** as such in courts of law or equity." We acknowledge that R.C. 1707.01(J) does not state the precise method to use to calculate current market price of securities sold in Ohio. The statute does, however, clearly indicate that the definition of fraud is to be derived from case law deciding this issue. Moreover, the General Assembly did not limit the source of the definition solely to courts of Ohio, or even to state courts generally, as it easily could have done. Rather, the legislature broadly drafted R.C. 1707.01(J) to draw from *all* securities case law defining fraudulent conduct in both state and federal courts. Interpreting R.C. 1707.01(J) as not including federal securities law as a defining source for "fraud" would require us to modify the statute by inserting the word "Ohio" or "state" before the phrase "courts of law or equity." We refuse to do so, for when construing a statute "it is the duty of this court to give effect to the words used, not to delete words used or to insert words not used." *Cleveland Elec. Illum. Co. v. Cleveland* (1988), 37 Ohio St.3d 50, 524 N.E.2d 441, paragraph three of the syllabus.

{¶ 14} As with most statutes, R.C. 1707.01(J) was drafted to address unforeseen variations in factual circumstances. Recognizing the creativity of unscrupulous securities dealers intent on defrauding Ohio investors, the General Assembly chose not to create a specific formula for calculating CMP and determining fraudulent conduct. Instead, the General Assembly drafted R.C. 1707.01(J) so that securities case law, both state and federal, provides the appropriate standards. This is sagacious for several reasons. First, the securities market is constantly evolving. By incorporating into the statute a larger body of

law by which to define fraudulent conduct, the General Assembly has provided for inevitable changes in market structure that might otherwise require redrafting of the statute. This has the desirable effect of preventing Ohio securities law from developing in a vacuum, and furthers the goal of unifying securities law.

{¶ 15} Second, federal standards for determining CMP are more well developed than state standards. Federal courts and administrative tribunals like the Securities and Exchange Commission have a greater experience with, and a more continuous exposure to, the complicated field of securities fraud cases and, consequently, provide a more extensive body of law to draw from in defining fraud. Therefore, we hold that R.C. 1707.01(J) provides constitutionally adequate notice that federal law may be applied to the conduct of licensed intrastate securities dealers for the purpose of calculating the current market price of over-the-counter securities and determining fraudulent conduct.

{¶ 16} Furthermore, we disagree with the suggestion that R.C. 1707.01(J) states a standard that is "impossible" for a reasonable securities dealer to discern. Many federal securities cases exist that provide a clear and workable method of calculating CMP, and set the standard for what constitutes an excessive price markup amounting to fraudulent conduct. See, *e.g*., *Charles Hughes & Co. v. SEC* (C.A. 2, 1943), 139 F.2d 434; *In the Matter of Alstead, Dempsey & Co., Inc.* (1984), SEC File No. 3-6135, 47 S.E.C. 1034. A review of the pertinent case law indicates that to determine current market price one of three methods is to be used, and is dependent on whether the dealer is a market maker.[1] If the dealer is a market maker,

---

1. Although the Act and the Ohio Administrative Code do not define "market maker," it is widely accepted that a market maker is a dealer who holds itself out to the public as willing to buy and sell securities as a principal, risking its own capital, and is willing to sell to both the public and other dealers.

    The trial court assumed *arguendo* that Skyline was a market maker. Due to the egregiously excessive markup of FiberCorp stock by Skyline, however, the trial court suggested that under any method of calculation, Skyline would be considered to have sold securities at a price not reasonably related to the market price.

then CMP should be calculated using the price at which the dealer trades with other dealers. If the dealer is not a market maker, then absent countervailing evidence, the contemporaneous cost to the dealer for the security is the best indication of current market price. The underlying policy behind both of these approaches is that a dealer is assumed to have expertise in the securities markets and will generally trade securities in dealer-to-dealer transactions for the prevailing market price. Finally, if no actual sales or contemporaneous prices are available, then pricing quotations, commonly referred to as "Pink Sheets," are a useful source to determine CMP, provided the price quotations are demonstrated to be reliable. *Alstead* at 1035-1036, 1038.

{¶ 17} In addition to clearly identifying the method for calculating current market price, federal securities case law also establishes the acceptable standard for a dealer markup. Typically, a dealer will purchase a security through a dealer-to-dealer transaction and then sell the security to a retail security investor at the current market price of that security plus a commission. This markup, or "spread," is the profit realized by the dealer from the trading of the security. See *Bank of Lexington & Trust Co. v. Vining-Sparks Securities, Inc*. (C.A.6, 1992), 959 F.2d 606, 613. A markup of five to ten percent above the current market price for an over-the-counter security is deemed acceptable by the SEC, and securities case law limits a dealer's spread to near that amount. *Charles Hughes & Co., Inc. v. SEC*, 139 F.2d at 437, fn.1; *Barnett v. United States* (C.A.8, 1963), 319 F.2d 340, 343.

{¶ 18} The record indicates that by calculating the current market price of FiberCorp over-the-counter stock based on dealer-to-dealer transactions, either under the contemporaneous sales method or the contemporaneous costs method, Skyline sold FiberCorp securities to Ohio retail investors at a price of 300 percent to 567 percent over the current market price for the stock and failed to disclose to its investors either the current market price of the FiberCorp stock or the exorbitant markup. Skyline contends that the CMP of an over-the-counter stock should be

determined by whatever price the dealer is able to sell the security to the investing public. This concept ignores the central objective of all securities legislation of providing protection for those unfamiliar with market conditions from the dishonesty of those who do. "'The best element of business has long since decided that honesty should govern competitive enterprises, and that the rule of *caveat emptor* should not be relied upon to reward fraud and deception.'" *Charles Hughes & Co.* at 437, citing *FTC v. Std. Edn. Soc.* (1937), 302 U.S. 112, 116, 58 S.Ct. 113, 115, 82 L.Ed. 141, 145.

**{¶ 19}** The judgment of the court of appeals is reversed, and the trial court's judgment is reinstated.

*Judgment reversed.*

DOUGLAS, WRIGHT, RESNICK, F.E. SWEENEY, PFEIFER and COOK, JJ., concur.

———————————