William T. WULIGER,
Receiver, Plaintiff,

v.

Dave CHRISTIE, Defendant.

No. 3:02–CV–7296.

United States District Court,
N.D. Ohio,
Western Division.

March 30, 2004.

Roger J. Katz, Victor M. Javitch, Javitch, Block, Eisen & Rathbone, Cleveland, OH, for Plaintiff.

Max E. Rayle, Rayle, Matthews & Coon, Bowling Green, OH, for Defendant.

## MEMORANDUM OPINION

KATZ, District Judge.

### INTRODUCTION

Plaintiff William T. Wuliger ("Wuliger") commenced this action against Defendant for recovery of commissions in connection with the sale of viatical investment. This case is an outgrowth of the *Liberte v. Capwill* [1] litigation which has spawned re-

---

1. *Liberte v. Capwill,* Case No. 5:99 CV 818 (N.D.Ohio) revolves around the viatical settle-

lated litigation both in the state and federal courts. The essence of this action contends that Defendant Dave Christie entered into an agent sales agreement whereby he solicited individuals to invest in viatical settlements offered by Alpha Capital Group ("Alpha"). In return, Christie is alleged to have received approximately $150,528.60 in commissions.

Wuliger was appointed Receiver of Alpha in the fall of 2001. Thereafter, he was authorized by the Court in the *Liberte* action, in part, to:

> [U]se his best judgment to protect the rights of Alpha investors and to discharge his duties in a manner calculated to preserve the greatest monetary recovery for the maximum number of all Alpha investors.

(*Liberte,* Doc. No. 1290.) One year later those responsibilities included the right to pursue actions against Liberte and Alpha agents and brokers. (*Liberte,* Doc. No. 1758.) More recently, the Court clarified the expanded role of both the General and Alpha Receivers, stating that:

> [I]n keeping with the ultimate goal of maximizing the estates for the benefit of the investors, [the Receivers] are empowered to represent and pursue the interests of the investors directly. The Receivers shall further continue to carry out their duties and obligations as set forth by previous and existing Order of the Court. Finally, the Receivers shall continue to coordinate their efforts with

class counsel to recover, protect and preserve receivership assets.

(Doc. No.1982.)

Wuliger initiated this suit in June 2002 against Christie alleging the following claims: (1) violations of the 1933 Securities Act, 15 U.S.C. § 77; (2) violations of the Securities Exchange Act of 1934, 15 U.S.C. § 78j; (3) violations under the Racketeer Influenced and Corruption Organizations Act[2], 18 U.S.C. §§ 1962 and 1964(c); (4) common law fraud; (5) unjust enrichment; (6) conversion; (8) breach of fiduciary duty and duty to act in good faith; and (8) intentional or negligent misrepresentation.

This matter comes before the Court on Plaintiff's motion for partial summary judgment on the issue of whether Alpha's viatical settlements are securities. Also before the Court is Defendant's motion for partial summary judgment as to the securities charges based upon the statute of limitations. Finally, the Defendant seeks oral argument on his motion for partial summary judgment. For the reasons stated below, Plaintiff's motion for partial summary judgment is granted and Defendant's motion for partial summary judgment is granted. The Defendant's motion for oral argument is denied as moot.

### SUMMARY JUDGMENT STANDARD

■ Under Rule 56, the claimant may move for summary judgment regarding "all or any part thereof" of a claim or counterclaim. When construing a motion for partial summary judgment, the court

---

ment industry. Plaintiff Liberte Capital LLC ("Liberte") and Intervening Plaintiffs Alpha Capital Group LLC and Integrity Management Partners, LLC (collectively "Alpha") were engaged in the business of purchasing insurance policies from terminally ill policyholders willing to sell their rights to the policies. Liberte also solicited investors for policies on the lives of seniors without terminal illness. Investors were solicited by Liberte and Alpha to purchase viatical life insurance

investment programs whereby investors were matched in many cases with the policy on the terminally ill person or "viator".

**2.** Contained within his motion for partial summary judgment at page 2, the Receiver advises of dismissal of the civil RICO claim and the same will be reflected in the Court's disposition of the pending motions.

employs the normal summary judgment standard. The effect of a partial summary judgment ruling is to narrow the issues for further disposition.

As an initial matter, the Court sets forth the relative burdens of the parties once a motion for summary judgment is made. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Of course, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. at 2553. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (*quoting* Fed.R.Civ.P. 56(e)).

Once the burden of production·has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. Summary judgment shall be rendered if

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c).

## PLAINTIFF'S MOTION REGARDING VIATICAL SETTLEMENTS AS SECURITIES

### A. *Relevant Precedent*

In *S.E.C. v. Howey,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), the Supreme Court defined the requirements of an investment contract necessary to place it within the definition of a security. There the respondent offered customers a land and service contract regarding its citrus acreage in Florida. The SEC brought suit to restrain respondents' use of mails and interstate commerce in offering and selling what it deemed unregistered securities. The Court noted how the Securities Act of 1933 defined the term "security", stating that its legal determination of this issue required consideration of all the circumstances and whether such contracts could be construed as investment contracts within the meaning of Section 2(1) of the Act. *Id.* at 296, 66 S.Ct. at 1102. The Court took notice of how the term "investment contract" was commonplace in state blue sky laws in existence prior to the federal statute. In spite of the fact many states did not have statutes which defined the term "investment contract," the Court noted such contracts:

> had been broadly construed by state courts so as to afford the investing public a full measure of protection. Form was disregarded for substance and emphasis was placed upon economic reality. An investment contract thus came to mean a contract or scheme for 'the placing of capital or laying out of money in a way intended to secure income or profit from its employment.'

*Id.* at 298, 66 S.Ct. at 1102. In light of this history, the Court found Congress included this term with that knowledge, thereby finding it "reasonable to attach that meaning to the term as used by Congress, especially since such a definition [wa]s consistent with statutory aims." On this basis, the Court stated the requirements regarding an investment contract as a "contract, transaction or scheme whereby a person invests his money in a commonplace enterprise and is led to expect profits solely from the efforts of the promoter or third party." *Id.* at 299, 66 S.Ct. at 1103. The definition was characterized by the Court as "a flexible rather than a static principle, one that [wa]s capable of adaptation to meet the countless and various schemes devised by those [ ] seek[ing] use of the money of others on the promise of profits." *Id. Accord S.E.C. v. Edwards,* —— U.S. ——, 124 S.Ct. 892, 157 L.Ed.2d 813 (2004).

Like the Supreme Court in *Howey,* the Sixth Circuit has taken a broad approach in determining what constitutes a security. *See Union Planters National Bank of Memphis v. Commercial Credit Business Loans, Inc.,* 651 F.2d 1174 (6th Cir.) *cert. denied,* 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981). While recognizing that literal inclusion in the statutory definition is not a prerequisite, the Sixth Circuit has advocated a liberal approach:

> In interpreting the Securities Acts, the rules of statutory construction have been subordinated to the doctrine that courts will construe the provisions of a statute in a manner consistent with its dominant purpose and will carry out the generally expressed legislative policy by reading the text in light of the context.

*Id.* at 1180. In adopting this approach, the Circuit also noted that "the Supreme Court has disregarded form in favor of substance and counselled that application of the federal securities statutes turns on

the 'economic realities' underlying a transaction." *Id.,* citing *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 848, 95 S.Ct. 2051, 2058, 44 L.Ed.2d 621 (1975).

With the binding precedent of the United States Supreme Court and the Sixth Circuit as a backdrop, the Court now turns to analyze whether a viatical settlement constitutes a security.

## B. Discussion

As directed by the relevant precedent above, the analysis must begin with the statutory definition of a security:

> The term "security" means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or in general, any instrument commonly known as a "security"; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or renewal thereof the maturity of which is likewise limited.

15 U.S.C. § 78c(a)(10).

■ Under the three-part test in *Howey,* the Court considers whether the inves-

tors here purchased with (1) an expectation of profits arising from (2) a common enterprise (3) dependent upon the efforts of others. The parties do not appear to dispute the first prong; therefore, for purposes of this discussion that prong will be deemed satisfied and the Court will turn to the remaining factors.

■■■ The second prong of the test under *Howey* requires horizontal commonality. *Hart v. Pulte Homes of Michigan Corp.*, 735 F.2d 1001, 1004 (6th Cir.1984). "Horizontal commonality requires sharing or pooling of funds in which fortunes of the individual investors are inextricably intertwined by contractual and financial arrangement." *Cooper v. King*, 114 F.3d 1186, 1997 WL 243424, *2 (6th Cir.1997)(unpublished), citing *Union Planters Nat'l Bank v. Commercial Credit Business Loans, Inc.*, 651 F.2d 1174, 1183 (6th Cir.1981).

In this instance, Alpha investors were often grouped with other investors and purportedly given a fractionalized interest in a particular policy. It is this pooling of funds, along with "joint participation in the same investment enterprise," which satisfies the common enterprise requirement. *Milnarik v. M–S Commodities, Inc.*, 457 F.2d 274, 276–77 (7th Cir.), *cert. den.*, 409 U.S. 887, 93 S.Ct. 113, 34 L.Ed.2d 144 (1972). The agency agreement "purported" to assign the investor to a particular policy "with sole and specific rights," a representation made to secure the sale which never came to fruition in many, if not most, instances. Moreover, the Supreme Court recently rejected an argument that an investment "scheme falls outside the definition because purchasers had a contractual entitlement to a return." *S.E.C. v. Edwards*, 124 S.Ct. at 898. Since the competent evidence establishes Alpha's practice of pooling its investors into poli-

cies, the horizontal commonality requirement under *Howey* is satisfied.

The Defendant advocates the absence of the third prong under *Howey*, thereby precluding a securities violation claim. In support of his position the Defendant relies upon the case of *S.E.C. v. Life Partners, Inc.*, 87 F.3d 536 (D.C.Cir.1996), wherein the D.C. Circuit held that selling viatical settlements was exempt from securities regulation. In a 2–1 decision, the court found that the investors' fractional interests were not securities "because the profits from their purchase d[id] not derive predominantly from the efforts of a party or parties other than the investors." *Id.* at 538. Specifically, the court found that post-purchase actions by the promoters were simply ministerial. Judge Wald's dissent, however, took issue with the majority's post-purchase activity, stating that by "[i]nsisting that some activity must occur after purchase but allowing any activity, no matter how trivial, to satisfy this requirement violates the principle that form should not be elevated over substance and economic reality."

In a subsequent decision denying a petition for a rehearing and a hearing en banc, the D.C. Circuit Court clarified its decision, finding that it did not adopt an "artificial bright-line rule" that an investment was not a security precluding consideration of pre-purchase efforts by promoters. *S.E.C. v. Life Partners*, 102 F.3d 587, 588–589 (D.C.Cir.1996). Nevertheless, the Court went on to discount the pre-purchase efforts in that case, noting the dispositive factor relative to success was the date of the death of the viator, not a factor within the promoter's control.

Although the issue raised in *Life Partners* has not had occasion to be addressed by the Sixth Circuit, this Court does not find the analysis by the D.C. Circuit to be persuasive. For example, in an analogous

case involving rare coin portfolios, the district court in *S.E.C. v. Brigadoon Scotch Distributors, Ltd.*, 388 F.Supp. 1288 (S.D.N.Y.1975) found the third prong under *Howey* satisfied where the fortunes of all investors were tied to the expertise of the promoter's efforts with the portfolios generally selected by the promoter's "experts," thereby establishing the investors' dependence on the expertise of the seller to produce the projected profit. As noted by the district court:

> Here the promoters are emphatically entrusted with the work and expertise of producing a pay off. For example, [the promoter] customarily, indeed in almost every case, 'selects the coins for investment purposes'[ ].

*Id.* at 1292.

More recently, a viatical investment program was also deemed to be a security as the district court held the *Howey* test to be satisfied. *S.E.C. v. Tyler*, Case No. 3:02–CV–0282–P, 2002 U.S. Dist. LEXIS 2952 (N.D.Tex.2002). There, the promoters enticed elderly investors by touting the investment's liquidity, a fixed interest rate, specific maturity date and maturity value at the outset of the investment. The promoter then took the investors' money and purchased fractional shares of viatical investments which had none of the attributes represented to the investor. In considering whether these investments constituted securities, the district court focused on the promoters representations to the investors in conjunction with the Supreme Court's

directive in giving a broad definition to a security coupled with "Congress' purpose in enacting the securities laws [ ] to regulate *investments*, in whatever form they are made and by whatever name they are called." *Id.* at *18, quoting *Reves v. Ernst & Young*, 494 U.S. 56, 61, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990) (emphasis in original). While the decision in *Life Partners* is characterized as having been largely unchallenged, it is perhaps a more accurate assessment to state that it has not altogether been embraced by other circuits and continues to generate much discussion in the academic realm [3].

Several state courts considering whether viatical settlements fall within their state securities laws have also undertaken discussion of the *Life Partners* decision, choosing either to reject it or respectfully distinguish their particular circumstances. For example, in *Siporin v. Carrington*, 200 Ariz. 97, 23 P.3d 92 (2001), the Arizona appellate court acknowledged the decision in *Life Partners* yet chose to distinguish its conclusion finding viatical settlements were securities since the policy set forth by the Arizona legislature required employing a broad definition of a security. "What truly determines viatical settlement profitability is the realization, over time, of an outcome predicted by the seller through its analysis of the viator's life expectancy, the soundness of the insurer, the actions need to keep the policy in effect for the original face amount, and the insurer's unconditional liability under the policy's terms." *Id.* at 104, 23 P.3d at 99.

---

**3.** *See e.g.*, Miriam R. Albert, *The Future of Death Futures: Why Viatical Settlements Must Be Classified As Securities*, 19 Pace L.Rev. 345 (1999); Timothy P. Davis, *Should Viatical Settlements Be Considered "Securities" Under The 1933 Securities Act?*, 6 Kan. J.L. & Pub. Pol'y 75 (1997); William L. Doerler, *SEC v. Life Partners, Inc.: An Extended Interpretation Of The Howey Test Finds That Viatical Settlements Are Investment Contracts*, 22 Del. J.

Corp. L. 253 (1997); Elizabeth L. Deeley, Note, *Viatical Settlements Are Not Securities; Is It Law Or Sympathy?*, 66 Geo. Wash. L.Rev. 382 (1998); Dave Luxenberg, Comment, *Why Viatical Settlements Constitute Investment Contracts Within The Meaning of the 1933 and 1934 Securities Act*, 34 Williamette L.Rev. 357 (1998); Andrew B. Wright, Comment, *Idaho at Crossroads: Choices for Regulating Viatical Settlements*, 29 Idaho L.Rev. 179 (2002).

Building upon the decision in *Siporin,* the Colorado court of appeals also concluded that units of funds were securities where investors were given certificates of investments by a viatical investment company. *Joseph v. Viatica Management, LLC,* 55 P.3d 264 (Colo.App.2002). Although the conduct of the investment company was post-investment, the Colorado court noted the investors relied entirely upon the company's investigation, analysis, selection of the viators and policies to be acquired, and negotiated terms of acquisitions. The panel in *Joseph* premised its holding, in part, upon the state securities act's underlying purpose and broad interpretation afforded thereto.

Last year, an Indiana appellate court considering Liberte Capital Group investments held the viatical investments constituted securities. *Poyser v. Flora,* 780 N.E.2d 1191 (Ind.App.2003). The court in *Poyser* flatly rejected the analysis in *Life Partners* despite finding the entrepreneurial activities of Liberte Capital occurred post-investment. The *Poyser* court noted its analysis was dependent upon "the economic realities of the transaction in light of Congressional intent." *Id.* at 1195. Although the Indiana legislature had recently amended its statutory framework to include viatical settlements within the definition of its state securities law, taking into account the guidance of the United State Supreme Court in *Forman* and *Howey* and finding the success of the enterprise rested with the purchaser, in the Liberte case such settlements were deemed securities under the Indiana Securities Act.

On the same date as *Poyser* was decided, the Michigan Court of Appeals also found viatical settlements to be securities. *Michelson v. Voison,* 254 Mich.App. 691, 658 N.W.2d 188 (2003). Like the other state appellate courts noted above, the court noted the viatical settlements had only recently been the object of legislation aimed at defining as securities viatical insurance contracts. The court in *Michelson* noted that interpretation of securities statutes required consideration of the substance as well as looking beyond form, with close attention to be paid to the economic realities of the situation. In employing a broad interpretation to Michigan's securities law, the state administrative agency's position, and other states' legislation on this issue, the subject viatical investments were also deemed to be securities.

The Defendant directs the Court to the Ohio appellate case of *Glick v. Sokol,* 149 Ohio App.3d 344, 777 N.E.2d 315 (2002) to further support his position. There, an investor alleged Ohio securities laws violations after they purchased fractional interests in viatical investments from the defendant financial advisors. The viatical investments were with Liberte Capital Group. Under the agreement between that plaintiff and Liberte, plaintiff authorized Liberte to locate appropriate viatical settlements, purchase interests on his behalf and pay premiums on the insurance policies. The investors claimed violations of R.C. § 1707.44(A), under Ohio's Securities Act and sought rescission of the investment. The trial court granted summary judgment in the investor's favor.

On appeal, however, the Tenth District Court of Appeals, in a 2–1 decision, reversed. It first noted that under existing law, viatical settlements were now securities as of October 5, 2001. The appellate court rejected the argument that these settlements could be considered securities since there was no official state legislative history to support the position that viatical settlements were securities subject to registration requirements prior to October 2001.

The panel in *Glick* next considered whether under the prior version of Ohio's law, namely R.C. 1707.01, viatical settlements fell within the general definition of securities. The court examined *State v. George*, 50 Ohio App.2d 297, 362 N.E.2d 1223 (1975), which performed an analysis of the term "security" mirroring that under *Howey*. In considering the aspects of *George*, the appellate court focused upon the seller/marketer's use of investor outlay relative to operation of the enterprise. Stated differently, "investor profit would theoretically increase as a result of [the distributor's] efforts." *Id.* at 348, 777 N.E.2d at 319. The *Glick* majority noted that the only variable impacting the profitability of the viatical settlements was the timing of the death of the insured and that the investors was "merely paying for administrative services," thereby distinguishing the viatical promoter's efforts from those constituting the "risks of the enterprise" element under *George*. The appellate court also noted the investment partnership's limited role in the enterprise. They were not, for example, involved in the escrow process or selection of viatical settlements. The court noted the agreement was between the investor and Liberte and "if, as the division determined, the viatical companies constitute an enterprise, the *George* analysis appears to apply to Liberte Capital and not the [investment partnership promoting the settlements]." *Id.* at 349, 777 N.E.2d 315. The lone dissenter concurred with the reasoning of the trial court.

The *Glick* decision rejected a position taken by the Ohio Division of Securities expressly concluding that the viatical settlements therein constituted securities. *Glick*, 149 Ohio App.3d at 348, 777 N.E.2d

at 319. In the third quarter of 1998, the Ohio Division of Securities responded to investor inquiries when it announced in its bulletin that viatical settlements were considered securities under the Ohio Securities Act. While the *Glick* majority disagreed with the Division's analysis under *George*, the majority panel advocated a position wherein the viatical settlement's status would be considered a security if Liberte had been a party to the action. However, since the promoter/insurance agent was the defendant and his activities were simply ministerial, the investments could not qualify as a security. The *Glick* majority, therefore, mistakenly construed the insurance agent's role in making its determination when it should have focused upon the conduct of the promoter, Liberte, whom the insurance agent represented. *See Poyser*, 780 N.E.2d at 1191 (suit against Liberte insurance agent for securities violation). If the viatical investment was deemed to be a security based upon Liberte's conduct/actions, its status would not change in a suit against Liberte's agent. While the remedies against the agent and promoter might differ, in the end the status of the viatical investment remains the same. Finally, even under the analysis by the majority in *Life Partners*, the post-purchase conduct by Liberte [4] was sufficient to meet the "efforts of others" test under *Howey*.

Recently, the same Ohio appellate court affirmed a decision from the Ohio Division of Securities finding the sale of viatical settlement contracts were securities. *Rumbaugh v. Ohio Dept. of Commerce*, 155 Ohio App.3d 288, 800 N.E.2d 780 (2003). In its analysis the appellate court in *Rumbaugh* presented a more extensive analysis and gave deference to the position

---

**4.** In *Glick*, Liberte was authorized "to locate appropriate viatical settlements, purchase interests in them on Glick's behalf, and pay premiums on the insurance policy." 149 Ohio App.3d at 344, 777 N.E.2d at 316.

of the Ohio Division of Securities as contrasted to that of the *Glick* panel. Examining the circumstances of that case under the *George* factors, the panel in *Rumbaugh* held that a viatical investment which predated the amendment to the Ohio securities law was, nevertheless, a security in the absence of statutory language to the contrary. Moreover, the *Rumbaugh* court recognized the broad treatment and application afforded to Ohio's Blue Sky Laws [5].

▋ Therefore, in determining whether the Alpha viatical investment met the requirements under *Howey*, this Court is mindful of the Supreme Court's admonition in *Tcherepnin v. Knight*, 389 U.S. 332, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967), which advocated a more expansive approach to interpreting the term "securities." This Court believes such approach should be "flexible rather than a static principle" since it must be applied to all types of schemes aimed at investors. *Howey*, at 299, 66 S.Ct. at 1103. In applying the "efforts of others" prong, this Court is of the view that the promoter's selection of the vehicle, in this instance a viatical policy, is critical to the investor's expectation of profit. Once the investor agreed to purchase a viatical settlement, Alpha, like Liberte, would match the viatical settlement in an insurance policy maintained by Alpha. There is nothing to suggest the investor was involved or instrumental in the selection of the appropriate viatical

policy, relying on the promise of the agent, broker or Alpha that their money would be in a matched policy. Thus, in this Court's view, it is not the date of the viator's death which establishes the success of the investment but the selection by the promoter of the policy into which the investor's money is placed, based upon its expertise in assessing the viator's life expectancy and other variables, which drives the success of the investment. It is this conduct which constitutes efforts of others under the broad construction advocated by the Supreme Court in *Howey*. Even under the analysis in *Life Partners*, such post-purchase conduct would suffice to meet the factors under *Howey*. However, to limit consideration to pre-purchase conduct would, in the words of Judge Wald, "violate[ ] the principle that form should not be elevated over substance and economic reality." 87 F.3d at 551.

▋ In the case *sub judice*, economic realities dictate against a narrow approach since there will always be opportunistic entrepreneurs who attempt to evade liability on those distinctions. In the end the investments offered by Alpha and peddled by its agent were an opportunity to "contribute or invest" money into a common enterprise and share profits derived, with the critical aspects of a successful investment riding on the "expertise" of Alpha. Keeping in mind the expansive approach

---

5. The purpose underlying Ohio's Act that was enacted:

> to prevent those persons willing to market worthless or unnecessarily risky securities from soliciting the purchasing public without first subjecting themselves and their securities to reasonable licensing and registration requirements designed to protect the public from its own stupidity, gullibility and avariciousness.

*Perrysburg Township v. City of Rossford,* 149 Ohio App.3d 645, 652, 778 N.E.2d 619, 624

(2002). *See also In re Columbus Skyline Securities, Inc.,* 74 Ohio St.3d 495, 498, 660 N.E.2d 427, 429 (1996) (courts to give liberal construction to the Ohio Securities Act). Moreover, Ohio courts have recognized that inclusion of an instrument in the list of transactions constituting securities is not dispositive of the issue and requires determination "made on a case-by-case basis with the 'primary emphasis on the economic realities of the instrument.' " *Perrysburg Township v. City of Rossford.* at 653, 778 N.E.2d at 624–625. (Citations omitted.)

employed in a securities analysis, the Court finds the viatical investments in this case constitute securities under the federal securities act. Accordingly, Plaintiff's motion for partial summary judgment (Doc. No. 44) is granted.

### DEFENDANT'S MOTION REGARDING THE APPLICABLE STATUTE OF LIMITATIONS

*A. The Parties' Positions*

The Defendant seeks summary judgment as to the securities violations contained in Counts 1 and 2 on the basis that they are barred by the statute of limitations. The Receiver's response is multifaceted. He contends that since he does not stand in the shoes of the investors application of the statute of limitations could not commence prior to his appointment by the Court. Therefore, he argues against being subject to the same defenses applicable to an Alpha investor in this circumstance. He further argues that to strictly construe the statute of limitations/statute of repose would be contrary to Congress's purpose behind the securities laws. Further, such application of the statutes would be detrimental to the present Alpha investors who hope to recover some portion of their initial investment through the efforts of the Alpha Receivership. Even under the applicable injury discovery rule, the Receiver was unable to begin discovery and ultimately commence these actions until after his appointment. Finally, since it is debatable as to whether a "sale" of securities took place, the statute of repose has yet to be triggered and Defendant's motion must be denied.

*B. Receiver's Appointment*

Federal equity receivers are appointed to take control, custody, and/or management of property involved in litigation. It is generally recognized that a receiver may bring suit to "accomplish the objective of the suit for which he or her appointment was made, or under the specific directions of the appointing court, or pursuant to his general duties to receive, control, and manage the receivership property." 12 Wright, Miller & Marcus, Federal Practice & Procedure § 2984 (2d ed.1997). *See also, Javitch v. First Union Securities, Inc.,* 315 F.3d 619, 626 (6th Cir.2003) ("question depends on the authority granted by the appointing court and actually exercised by the receiver"); 65 Am.Jur.2d Receivers § 129 (2d ed.) (powers of a receiver flow from statute, court rules, orders of appointment and subsequent orders of appointing court). By the same token "[a] receiver stands in the shoes of the person for whom he has been appointed and can assert only those claims which that person could have asserted." *Armstrong v. McAlpin,* 699 F.2d 79, 89 (2d Cir.1983).

The Receiver is correct that at the time he instituted the suit *sub judice,* he did not stand in the shoes the Alpha investors. In fact, it was not until several months later that the Court authorized the Receiver as follows:

> [A]ll claims against former agents and/or brokers of Alpha and Liberte for damages in contract or tort actions arising out of claims by investors are deemed to be assets of the receivership estates and must be filed by the Receivers, if at all.

*Liberte,* Doc. No. 1758. Therefore, until this authorization was in place, the Receiver properly contends that he was prohibited from asserting these securities violation claims. While this premise is correct, until the grant of express authorization of the Court, the securities violations alleged herein could only have been asserted by the investors themselves.

There is no basis in law which allows circumvention of the applicable statute of limitations in situations where a non-governmental receiver is appointed by the court. *See* 1 CLARK ON RECEIVERS § 268.1 (3d ed.1959) (generally the "mere appointment of a receiver does not in any way affect the running of the statute of limitations"). Arguments of a similar nature were rejected by the district court in *Friedlob v. Trustees of the Alpine Mut. Fund Trust,* 905 F.Supp. 843 (D.Colo. 1995). There a receiver of an investment trust brought suit against former administrators, contending securities violations under both the 1933 and 1934 Acts. In opposing summary judgment, the receiver opposed application of the one year statute of limitations and three year statute of repose under §§ 77m and 78j(e). After finding tolling principles inapplicable, the court rejected the receiver's attempt to characterize his status as on par with that of the SEC in an enforcement action. The district court determined that the one year statute of limitations and three year statute of repose were applicable to the court appointed receiver. *Id.* at 853.

Absent any authority which allows circumvention of the applicable statute of limitations, the Receiver's arguments advocating their commencement contemporaneous with his appointment are without merit. The Court next turns to whether commencement of this action was outside the statute of limitations and/or statute of repose.

*C. Relevant Statutes of Limitations*

■ The starting point for this analysis begins with the relevant statute. Regarding statutory construction, the Sixth Circuit has set forth the following guidelines:

"In all cases of statutory construction, the starting point is the language employed by Congress." *Appleton v. First*

*Nat'l Bank of Ohio,* 62 F.3d 791, 801 (6th Cir.1995). Moreover, where "the statute's language is plain, the sole function of the courts is to enforce it according to its terms." *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (citation and internal punctuation omitted). *Chapman v. Higbee Co.,* 319 F.3d 825, 829 (6th Cir.2003). It is only when "a literal interpretation would lead to internal inconsistencies, an absurd result, or an interpretation inconsistent with the intent of Congress" that a court may "look beyond the language of the statute." *Dorris v. Absher,* 179 F.3d 420, 429 (6th Cir.1999), citing *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981).

The statute of limitations applicable to the claim under the 1933 Act is set forth at 15 U.S.C. § 77m, which states as follows:

No action shall be maintained to enforce any liability created under section 77k or 77l (a)(2) of this title *unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence,* or, if the action is to enforce a liability created under section 77l (a)(1) of this title, unless brought within one year after the violation upon which it is based. *In no event shall any such action be brought to enforce a liability created under section 77k or 77l(a)(1) of this title more than three years after the security was bona fide offered to the public, or under section 77l(a)(2) of this title more than three years after the sale.*

(Emphasis added.) In *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), the Supreme Court adopted the one

and three year periods of limitations found in sections 9(e) and 18(a) of the 1934 Act and in section 13 of the 1933 Act. Therefore, in order to maintain a private securities action under section 9(e), the action must be "brought within one year after the discovery of the facts constituting the violation and within three years after such violation." 15 U.S.C. § 78i(e).

### D. Application of the Statute of Limitations and Statute of Repose

#### 1. Inquiry Notice

 In the Sixth Circuit, the applicable one year statute of limitation is triggered by inquiry notice. *New England Health Care Employees Pension Fund v. Ernst & Young*, 336 F.3d 495, 500 (6th Cir.2003), *cert. denied*, —— U.S. ——, 124 S.Ct. 1424, 158 L.Ed.2d 87 (2004). *See also, Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F.Supp. 1101, 1118 (W.D.Mich.1996) (noting applicability of one and three year rule to claims brought under both Exchange and Securities Acts as well as trigger under inquiry notice standard). *See also, Tregenza v. Great American Communications Co.*, 12 F.3d 717, 718 (7th Cir.1993), *cert. denied*, 511 U.S. 1085, 114 S.Ct. 1837, 128 L.Ed.2d 465 (1994).

 In *New England*, the Sixth Circuit discussed considerations relevant to inquiry notice as follows:

The majority view, [ ], is that knowledge of suspicious facts—"storm warnings," they are frequently called—merely triggers a duty to investigate, and that the limitation period begins to run only when a reasonably diligent investigation would have discovered the fraud... This view, we believe, reflects an appropriate balance between "the staunch federal interest in requiring plaintiffs to bring suit promptly... and the equally strong interest in not driving plaintiffs to bring suit ... before they are able, in the exercise of reasonable diligent, to discover the facts necessary to support their claims... We conclude, in accordance with the majority view, that the § 9(e) limitations period begins to run when a plaintiff should have discovered, by exercising reasonable diligence, the facts underlying the alleged fraud.

336 F.3d at 501. (Citations omitted.) Based upon this standard, the relevant issue is when "storm warnings" were on the radar sufficient to alert the claimant that things were amiss, thereby triggering the claimants to exercise reasonable diligence in discovering the facts forming the basis of their claim. Moreover, the plaintiff is charged with the burden of establishing the action was commenced within the statute of limitations, therefore he must demonstrate "the point at which he knew or should have known of the fraud." *Harner v. Prudential Securities Inc.*, 785 F.Supp. 626, 632 (E.D.Mich.1992), *aff'd* 35 F.3d 565 (6th Cir.1994).

The *Liberte* action was commenced on April 8, 1999. Just four days later, Alpha Capital Group filed their motion to intervene in the litigation. Their amended complaint, filed on September 1, 1999, contained the following allegations:

37. Simultaneous with the commencement of this action, the United States Marshall's [sic] Service seized VES's and CFL's records, including records pertaining to Alpha and Integrity. Based upon the plaintiffs' review of those records, plaintiffs discovered that Capwill, acting unlawfully and in violation of his fiduciary and other duties, had converted, misappropriated and looted over $40 million of funds belonging to plaintiffs and their customers.

*Liberte*, Doc. No. 191.

By July 2000, an Alpha investor, Kevin Knox, attempted to intervene on behalf of

himself and other Alpha investors, proposing a class action to "represent the thousands of investors whose money has been lost due to the malfeasance of Alpha, VES, Capwill and others." *Liberte,* Doc. No. 560. Attached to Knox's motion was a June 30, 1999 letter from Alpha's counsel to investor Knox advising the investor of the litigation against VES. *Id.* Exh. A. Alpha sent a follow-up letter, dated July 28, 1999, responding to investor inquiries seeking additional information and addressing frequently asked questions. *Id.* at Exh. B. Knox also attached a March 15, 2000 Alpha investor newsletter providing updates regarding the *Liberte* litigation.

Based upon the filings in the *Liberte,* it is clear that the Alpha investors were on notice of the problems with their investments as early as July 1999 and certainly no later than July 2000. According to these documents, they were aware of the purported fraud by Capwill and VES and the resulting havoc upon Alpha investors. In addition, they were also aware of the alleged misconduct of Alpha, as alleged by Knox's putative class action, which was ultimately denied. The second status report of the General Receiver, in October 2000 (Doc. No. 787) addressed efforts to recover commissions from Liberte and Alpha agents and brokers. This information was contained on the Court's docket, available to all counsel, including the Plaintiff who was acting counsel for Alpha. Also at that time the General Receiver's website contained this and other information for purposes of informing the investors.

■ This Court is mindful that inquiry notice does not require knowledge of all facts necessary to bring an action. *See Fujisawa Pharmaceutical Co., Ltd. v. Kapoor,* 115 F.3d 1332, 1334–1335 (7th Cir. 1997); *Caviness v. Derand Resources Corp.,* 983 F.2d 1295, 1303 (4th Cir.1993). *See also In re Worldcom, Inc. Securities Litigation,* 294 F.Supp.2d 431, 444–445 (S.D.N.Y.2003); *In re Merrill Lynch & Co., Inc.,* 273 F.Supp.2d 351, 379–380 (S.D.N.Y.2003). However, considering the relevant information available to the investors, circumstances were sufficient to place the Alpha investors on notice as to serious problems with their investments. Despite the evolving nature of the *Liberte* case, the Alpha investors knew the identities of their agents as the agents were the conduit through which the viatical settlement were presented to them. The pursuit of information and/or claims relative to those agents by the investors was not prohibited by the Court until October 2002, as previously referenced. In this Court's view, the "storm warnings" were brewing and sufficiently developed to have placed a reasonable investor on notice as to the possibility of misrepresentations no later than the end of 2000. Since this litigation was not commenced until June 2002, it is clearly outside the one year statute under the applicable statutes of limitations.

### 2. *Statute of Repose*

Assuming *arguendo* that this action was timely filed following inquiry notice, the analysis must also consider application of the three year statute of repose. The statute clearly states that "[i]n no event shall such action be brought to enforce a liability created under section 77k or 77l(1) of this title more than three years after the security was bona fide offered to the public or under section 77l(2) of this title more than three years after the sale." 15 U.S.C. § 77m.

■ Unlike statutes of limitations, statutes of repose serve to extinguish the claim and "rest[ ] on the time from some initiating event unrelated to an injury." *Combs v. International Ins. Co.,* 354 F.3d 568, 589 n. 11 (6th Cir.2004) (citation omitted). Relevant to the issue at hand, claims

brought after the three year period of repose which are triggered by the last event underlying the claim are barred regardless of when the plaintiff discovered the facts. *See Walck v. Am. Stock Exch.*, 687 F.2d 778 (3d Cir.1982); *In re Integrated Res. Inc., Real Estate*, 851 F.Supp. 556 (S.D.N.Y.1994) (three-year statute of limitations period absolute and cannot be tolled under the fraudulent concealment or discovery doctrines).

■ The statutory language identifies a sale as the triggering event. The Receiver advocates absence of a "sale" since a number of Alpha investors were not placed or matched in a particular settlement. On this basis, he argues the statute of repose has yet to be triggered. In contrast, the Defendant submits his uncontroverted affidavit attesting to the dates and names of clients to whom he sold Alpha viatical settlements.

As with the determination of what constitutes a security, the definition of the term "sales" has been liberally construed under the federal securities laws. *See Ballard & Cordell Corp. v. Zoller*, 544 F.2d 1059, 1063 (10th Cir.1976). The Second Circuit rejected the view that the failure to issue a security could circumvent liability under Rule 10b–5. *Sulkow v. Crosstown Apparel Inc.*, 807 F.2d 33 (2d Cir.1986) "A person who has made material misrepresentations in inducing another to part with something of value for the purchase of a security may not escape liability under Rule 10b–5 simply by refusing to issue a written instrument evidencing the security." *Id.* at 36 and citing legislative history. More recently, a district court rejected a similar challenge by a corporation bringing suit under the 1934 Act and seeking to evade application of a three year statute of repose under § 78cc(b)(2)(B). *Celsion Corp. v. Stearns Management Corp.*, 157 F.Supp.2d 942 (N.D.Ill.2001).

Like the Receiver in the present action, the plaintiff corporation in *Celsion* argued the statute of limitations did not begin to run since the stock purchase warrants had not been executed. The Court's discussion is instructive:

A cause of action under the Act accrues and the statute of limitations begins to run "on the date the sale of the instrument is complete." *McCool v. Strata Oil. Co.*, 972 F.2d 1452, 1460 (7th Cir.1992) ( ). A sale occurs when the parties to a transaction have obligated themselves to carry it out, with nothing further remaining to be done but the performance of functions such as paying the purchase price and transferring title to, or possession of, the securities. *Adams v. Cavanagh Communities Corp.*, 847 F.Supp. 1390, 1404 (N.D.Ill. 1994). A contract for the issuance or transfer of a security may qualify as a sale under the securities laws even if the contract is never fully performed. *Yoder v. Orthomolecular Nutrition Inst., Inc.*, 751 F.2d 555, 559 (2d Cir.1985).

In his complaint, the Receiver references commissions received by the Defendant in return for payment by Alpha investors of "$1,627,835.01 which represents the total dollar amount that Defendant's clients, Alpha Capital investors, paid for such securities." Compl. at ¶ 38. This supports the position that there was value paid or delivered by the investors in return for an interest given that commissions were earned by the Defendant, presumably upon consummation of the transaction. Accordingly, if the last sale occurred in February 1999, the applicable three year statute of repose would have run no later than February 2002.

■ The Receiver also contends that application of the statute of repose could not have commenced and been extin-

guished before it was possible to commence this action. However, a recent decision from the Second Circuit addresses this concern:

> [A] statute of repose begins to run without interruption once the necessary triggering event has occurred, even if equitable considerations would warrant tolling or even if the plaintiff has not yet, or could not have, discovered that she has a cause of action.

*P. Stolz Family Partnership L.P. v. Daum*, 355 F.3d 92, 102–103 (2d Cir.2004), citing *Jackson Nat. Life Ins. Co. v. Merrill Lynch & Co., Inc.*, 32 F.3d 697, 704 (2d Cir.1994). The Court in *Stolz*[6] explained the rationale as follows:

> In general, a statute of repose acts to define temporally the right to initiate suit against a defendant after a legislatively defined time period. Unlike a statute of limitations, a statute of repose is not a limitation of a plaintiff's remedy, but rather defines the right involved in terms of the time allowed to bring suit...
>
> In principle, by limiting the substantive or procedural rights of plaintiffs, all statutes of limitation or repose always tend to cut against the remedial results that plaintiffs might otherwise enjoy. And these remedial results may be best furthered, without losing one of the principal benefits of a statute of repose—to provide an easily ascertainable and certain date for the quieting of litigation—by lengthening the period before repose takes effect.

*Id.* at 102–104.

In this instance, the Court is well aware of the purpose behind federal securities laws in terms of protecting investors. By setting statutes of limitations and statutes of repose, however, Congress also recognized a definitive end to liability from suit. In considering statutory language, a court must be careful not to "construe a statute in a manner that renders part of the law superfluous." *United States v. Perry*, 360 F.3d 519 (6th Cir.2004) (citations omitted). The Receiver's position that the statute of limitations has yet to be commenced would fly in the face of straightforward statutory construction as advocated by the Sixth Circuit and run contrary to Congress's clear intent.

It is undisputed that the last sale by Defendant to an Alpha investor was in February 1999. As this action was not initiated until June 14, 2002, it is clearly outside the statute of repose. Accordingly, Defendant's motion for partial summary judgment is well taken as to the claims contained in Counts 1 and 2.

### CONCLUSION

Based upon the foregoing, the Court grants Plaintiff's motion for partial summary judgment (Doc. No. 44). The Court also grants Defendant's motion for partial summary judgment (Doc. No. 28) and Counts 1 and 2 are dismissed. In addition, Count 3 of the complaint is dismissed with prejudice. Finally, the Defendant's motion for a hearing (Doc. No. 43) is denied as moot. A status conference is scheduled for April 12, 2004 at 11:00 a.m.

IT IS SO ORDERED.

### *JUDGMENT ENTRY*

For the reasons stated in the Memorandum Opinion filed contemporaneously with

---

**6.** *Stolz* involved unregistered securities and whether the statute of repose was triggered upon the first bona fide offering to the public or the last offering. In its decision, the Second Circuit noted that the SEC in its *amicus* brief provided "evidence suggesting that Congress intended the three-year period to begin to run when a security is *first* sold to the public." *Id.* at 105 (emphasis in original).

this entry, IT IS HEREBY ORDERED, ADJUDGED and DECREED that Plaintiff's motion for partial summary judgment (Doc. No. 44) is granted.

FURTHER ORDERED that Defendant's motion for partial summary judgment (Doc. No. 28) is granted and Counts 1 and 2 are dismissed.

FURTHER ORDERED that Count 3 of the complaint is dismissed with prejudice.

FURTHER ORDERED that Defendant's motion for a hearing (Doc. No. 43) is denied as moot.